*229 ORDER
(Reversing & Remanding)
TODD R. MATHA, Chief Judge.
INTRODUCTION
The Court must determine whether to uphold the adjudicative decision of the Ho-Chunk Insurance Review Commission (hereinafter HIRC). The Court reverses the agency final determination since not supported by substantial evidence. The analysis of the Court follows below.
PROCEDURAL HISTORY
The petitioner, Sharon L. Williams, by and through Attorney Ronald M. Fitzpatrick, filed her Petition for Administrative Review on May 24, 2007. See Ho-Chunk Ins. Review Commission Establishment & Org. Act. 1 HCC § 13.4; see also Ho-Chunk Nation Rules of Civil Proce *230 dure (hereinafter HCN R. Civ. P.), Rule 68(A)(1)(b). On May 30, 2007, the Court entered the Scheduling Order, setting forth the timelines and procedures to which the parties should adhere during the pendency of the appeal. In response, the respondent submitted the administrative record on June 6, 2007.[1] See HCN R. Civ. P. 63(D).
The petitioner next filed a timely Initial Brief on June 21, 2007. Id., Rule 63(E). The respondent, by and through Attorney Michael P. Murphy, filed a timely Response Brief on July 23, 2007.[2] Id. The petitioner filed an untimely Reply B rief on August 6, 2007, thereby precluding judicial consideration of the document. Id, Neither party requested the ability to present oral argument, prompting the Court to determine the matter on the documentary materials. Id., Rule 63(G); Scheduling Order at 3.
APPLICABLE LAW
CONSTITUTION OF THE HO-CHUNK NATION
Art. VII—Judiciary
Sec. 6. Powers of the Tribal Court.
(a) The Trial Court shall have the power to make findings of fact and conclusions of law. The Trial Court shall have the power to issue all remedies in law and in equity including injunctive and declaratory relief and all writs including attachment and mandamus.
HO-CHUNK INSURANCE REVIEW COMMISSION ESTABLISHMENT & ORGANIZATION ACT, 1 HCC § 13
Subsec. 1. Authority.
c. The Legislature established the Ho-Chunk Insurance Review Commission on April 21, 1997.
Subsec. 3. Mission. The Insurance Review Commission shall hear appeals on Ho-Chunk Nation’s employee benefit insurance plan(s) decisions relating to employment.
Subsec. 4. Powers. The Commission shall have the power to review and render a final decision on all insurance claims. Such decision shall be for the benefit of employees who have been denied benefits under Ho-Chunk Nation insurance plans. The Insurance Review Commission decisions shall be final subject to review by the Ho-Chunk Nation Trial Court. A party seeking review of a final decision by the Ho-Chunk Nation Trial Court must file a request with the Court within thirty (30) days of the issuance of the final decision.
Subsec. 5. Scope. The Commission shall hear appeals for the following insurance plans.
a. Worker’s Compensation Plan.
Subsec. 9. Commission Decisions.
a. In its review of insurance plan decisions, the Commission shall review the entire record and take into consideration the findings and conclusions of the Insurance Plan determinations.
*231 b. The Commission may issue an oral decision at the hearing, but shall confirm the oral decision with a written decision. The written decision shall be issued within ten (10) days and shall contain the reason(s) behind the Commission decision. All interested parties shall be notified if [sic ] the Commission decision within ten (10) days of the written decision.
WORKER’S COMPENSATION PLAN (Adopted Oct. 1998)
Sec. 1—Definitions
Subsec. 1.005. Compensation Rates.
66 2/3 percent of the Weekly Wage ..., subject to the maximum of $466.00 per week. A reduction of 25 percent of Weekly Wage will be enforced when safety equipment is required, but not used. Rate of pay determined at time of injury will be used throughout the term of loss.
Subsec. 1.007. Compensable or Compen-sable Injury.
A bodily Injury, of an Employee, caused by an Accident wfoen that injury arises out of risk of Employment, the injury occurs during a period of Employment and while performing the duties of the Employment in or on the premises of the Employer or whenever the Employer requires the Employee to perform the Employment activities.
Subsec. 1.008. Bodily Injury or Injury.
Actual physical injury to the body that arises by accident under circumstances that constitute a Compensable Injury as defined in 1.007.
Subsec. 1.009. Accidents.
A specific occurrence, neither expected nor intended, which causes Bodily Injury to an Employee and arises under circumstances constituting a Compensable Injury.
Subsec. 1.013. Primary Physician. ;
Approved Health Care Providers by the Ho-Chunk Nation within 75 miles of the employee’s home at the time of the injury and from whom the Employee receives medical treatment for a Compensable Bodily Injury.
Subsec. 1.014. Referral Physician.
A licensed medical doctor or chiropractor to w'hom the Employee is referred by the Primary Physician for further specialized treatment with the approval of the Administrator of the Nation.
Subsec. 1.015. Independent Medical Examination.
A medical examination and/or evaluation of the Employee scheduled by the Nation or Administrator, at the Nation’s expense, for the purpose of obtaining medical information or opinion.
Subsec. 1,016. Administrator.
Crawford & Co., Administrators, with whom the Nation has contracted to act on behalf of the Nation in the administration of this plan.
Sec. 2—Purpose and Scope
Subsec. 2.001. The purpose of this plan is to provide a system of compensation and medical benefits for employees of the Nation who suffer Compensable Injuries in the Employment of the Nation. Benefits under the plan are the Employee’s exclusive remedy against the Nation.
Sec. 4—Medical Benefits
Subsec. 4.001. The plan will pay the cost of all reasonable and necessary First Aid, Medical, Surgical and Hospital services incurred by the Employee as direct result of a Compensable Bodily Injury subject to the following restrictions.
Subsec. 4.003. The Plan will pay hospital and related charges only for services ordered by the Primary or Referral Physician.
*232 Subsec. 4.004. This Plan will pay the reasonable and necessary medical costs and the cost of medicines and supplies and equipment of a therapeutic nature to treat the Bodily Injury only if ordered by the Primary or Referral Physician.
Subsec. 4.010. When an employee has reached their end of healing, payments for medical cost [sic ] will cease.
Sec. 5—Disability Benefits
Subsec. 5.004. Permanent Disability.
This benefit is intended to compensate the injured Employee for any permanent loss of or loss of use of a member suffered directly as a result of a Compensable Bodily Injury. Preexisting disabilities are not to be included when rating a permanent Partial Disability. A rating of Permanent Partial Disability must represent only that loss resulting solely from the Compensable Bodily Injury. All ratings of Permanent Partial Disability shall be based on the Permanent Disability Schedule adopted by the Nation and attached to this Plan and designated as Addendum Number 1. In cases of Permanent Partial Disability due to injury to a member, resulting in less than total loss of the member, not otherwise compensated in this schedule, compensation shall be paid at the prescribed rate during that part of the time specified in the schedule for the total loss of the member which the extent of the injury to the member bears to its total loss. The amount payable to the Employee shall be paid in one lump sum. Payment will be made as soon as reasonably possible after receipt of the rating by the Administrator, but no later than 30 days after receipt unless the Administrator has scheduled an Independent Medical Examination. Benefits paid for permanent partial disability shall be computed at two-thirds of the average weekly earnings of the employee, up to a maximum weekly benefit of $158.[00], and multiplied by the calculated proportion of the number of weeks specified in the Schedule.
Subsec. 5.008. If a Bodily Injury results in a disability that is partially due to congenital condition or a prior disease or injury, the benefits payable for the disability will be reduced by the proportion of the disability that is due to the preexisting disability.
Subsec. 5.011. When an employee has reached their end of healing payment for loss of time will cease.
Sec. 9—Administrator
Subsec. 9.001. The Administrator will act on behalf of the Nation in receiving and processing Worker’s Compensation claims under this Plan. The responsibility of the Administrator to make determinations and decisions will include, but not to be limited to, the following areas.
A) Based upon investigation and available medical information, the Administrator will make a determination of the responsibility of the Nation and will either accept or deny a claim. Within 30 days of receipt of a First Report of Injury, the Administrator will advise the Employee and the Nation of its determination.
B) The Administrator will determine the reasonableness and necessity of medical care and charges under section 4 and will determine amounts payable under the Plan. The Administrator will also approve or disapprove any change of Primary Physician, Referral Physician, or Surgical Procedure.
C) Based on information supplied by the Employer and/or Employee, the Administrator will determine the Compensation Rate payable for Temporary Total, Temporary Partial, Permanent Partial Disability and for Dependency.
Sec. 10—Appeals *233 Subsec. 10.001. The Ho-Chunk Nation will create an Appeal Board to hear any issues and make any necessary final determination relative to Compensability of Bodily Injury, medical care or charges, extent of Disability, Dependency, or any other issue that may arise under this Plan.
Subsec. 10.002. The Appeal Board will consider evidence, hear witnesses and receive exhibits in keeping with its goals of making a just final determination.
Subsec. 10.003. The Appeal Board will weigh the evidence, testimony of the witnesses] and exhibits and will make its decision on the basis of the preponderance of evidence and credibility of the evidence and witnesses.
Subsec. 10.009. An Appeal Board decision must be issued in writing and copies must be mailed to all interested parties. The decision need not recite nor review the evidence or testimony nor need compare the merits of the evidence or testimony of the opposing parties. The decision need only set out the final determination of the Appeal Board on all issues before it.
Add. 1—Permanent Disability Schedule Disability Benefits
Loss of arm at elbow 450 weeks
HO-CHUNK NATION RULES OF CIVIL PROCEDURE
Rule 58. Amendment to or Relief from Judgment or Order.
(A) Relief from Judgment. A Motion to Amend or for relief from judgment, including a request for a new trial shall be made within ten (10) calendar days of the filing of judgment. The Motion must be based on an error or irregularity that prevented a party from receiving a fair trial or a substantial legal error that affected the outcome of the action.
(B) Motion for Reconsideration. Upon motion of the Court or by motion of a party made not later than ten (10) calendar days after entry of judgment, the Court may amend its findings or conclusions or make additional findings or conclusions, amending the judgment accordingly. The motion may be made with a motion for a new trial. If the Court amends the judgment, the time for initiating an appeal commences upon entry of the amended judgment. If the Court denies a motion filed under this Rule, the time for initiating appeal from the judgment commences when the Court denies the motion on the record or when an order denying the motion is entered, whichever occurs first. If within thirty (30) days after the filing of such motion, and the Court does not decide a motion under this Rule or the judge does not sign an order denying the motion, the motion is considered denied. The time for initiating the appeal from judgment commences in accordance with the Rules of Appellate Procedure.
(C)Motion to Modify. After the time period in which to file a Motion to Amend, of a Motion for Reconsideration has elapsed, a party may file a Motion to Modify with the Court. The Motion must be based upon new information that has come to the party’s attention that, if true, could have the effect of altering or modifying the judgment. Upon such motion, the Court may modify the judgment accordingly. If the Court modifies the judgment, the time for initiating an appeal commences upon entry of the modified judgment. If the Court denies a motion filed under this Rule, the time for initiating an appeal from the judgment commences when the Court denies the motion on the record or when an order denying the motion is entered, whichever occurs first. If within thirty (30) calendar days after the filing of such motion, and the Court does not decide the motion or the judge does not sign an order *234 denying the motion, the motion is considered denied. The time for initiating an appeal from judgment commences in accordance with the Rules of Appellate Procedure.
(D) Erratum Order or Re-issuance of Judgment. Clerical errors in a Court record, including the Judgment or Order, may be corrected by the Court at any time.
(E) Grounds for Relief. The Court may grant relief from judgments or orders on motion of a party made within a reasonable time for the following reasons: (1) newly discovered evidence which could not reasonably have been discovered in time to request a new trial; (2) fraud, misrepresentation or serious misconduct of another party to the action; (3) good cause if the requesting party was not personally served in accordance with Rule 5(c)(l)(a)(i) or (ii), did not have proper service and did not appear in the action; or (4) the judgment has been satisfied, released, discharged or is without effect due to a judgment earlier in time.
Rule 61. Appeals.
Any final Judgment or Order of the Trial Court may be appealed to the Supreme Court. The Appeal must comply with the Rules of Appellate Procedure, specifically Rules of Appellate Procedure, Rule 7, Right of Appeal. All subsequent actions of a final Judgment or Trial Court Order must follow the Rules of Appellate Procedure.
Rule 63. Judicial Re view of Administrative Adjudication.
(A) Any person aggrieved by a final agency decision may request that the Ho-Chunk Nation Trial Court review such decision by filing a Petition for Administrative Review with the Court within thirty (30) calendar days of such decision, unless otherwise provided.
1. The following laws provide for filing within thirty (30) days:
b. Ho-Chunk Insurance Review Commission Establishment and Organization Act
(B) The Petition for Administrative Review shall identify the petitioner making the request by name and address. The Petition for Administrative Review must also contain a concise statement of the basis for the review, i.e., reason or grounds for the appeal, including a request to supplement the evidentiary record pursuant to HCNR. Civ. P. 63(D)(1)(a-b), if applicable. The statement should include the complete procedural history of the proceedings below. The petitioner must attach a copy of the final administrative decision to the Petition far Administrative Review.
(D) The commission or board, designated as the respondent, must transmit the administrative record to the Court within fifteen (15) days after receipt of the Petition for Administrative Review. The administrative record shall constitute the sole evidentiary record for judicial review of the agency decision....
(E) Within thirty (30) calendar days of filing the Petition for Administrative Review, the petitioner shall file a written brief, an Initial Brief.... The respondent shall have thirty (30) calendar days after filing of the brief in which to file a Response Brief. After filing of respondent’s Response Brief, the petitioner may file the Reply Brief within ten (10) calendar days.
(F) The administrative record shall consisl of all evidence presented to the agency, including but not limited to:
2. a transcript of the proceedings, which may be in digital or other electronically recorded format, sufficiently clear so that the Court may determine what transpired in the proceedings.
*235 (G) At the discretion of the Court, the Court may require an oral argument. The Court shall decide the order of the presentation, the length of time each party is permitted for their presentation, the issues to be addressed in oral argument, and such other matters as may be necessary. An order entitled, Notice of Oral Argument, shall include all such matters and shall be served on all parties at least ten (10) calendar days prior to the date set for argument.
(H) The Court shall decide all cases upon the administrative record, briefs, memo-randa and statements filed plus the oral argument, if heard.
(L) Either party may appeal the Trial Court’s decision to the Supreme Court.
FINDINGS OF FACT[3]
1. The petitioner, Sharon L. Williams, is a non-member, and was employed as a Blackjack Dealer at Ho-Chunk Casino located on trust lands at S3214 Highway 12, Baraboo, WI 53913. Initial Br. at 1; see also Order Granting Additional Benefits (HIRC, Mar. 22, 2002) at 1.
2. The respondent, HIRC, is a statutorily established entity of the Ho-Chunk Nation (hereinafter HCN or Nation) with principal offices located on trust lands at HCN Headquarters. HIRC Establishment & Oeg Act, § 13.1 c. The Nation is a federally recognized Indian tribe. See 72 Fed.Reg. 13648 (Mar. 22, 2007).
3. The petitioner filed her first administrative appeal on May 24, 2002, which resulted in a stipulated remand to the respondent.[4] Stipulation & Order to Remand, CV 02-48 (HCN Tr. Ct, Feb. 17, 2003). On September 6, 2005, the petitioner appealed the July 15, 2005 HIRC decision rendered upon remand, which again resulted in a stipulated remand to the respondent. Correspondence of Resp’t, CV 02-48 (Feb. 27, 2006).
4. On April 21, 2007, the respondent heard the second remand, and entered its final determination four (4) days later. Decision & Order (HIRC, Apr. 25, 2007). The petitioner timely appealed this final determination. See HIRC Establishment & Oeg. Act, § 13.4; see also HCN R. Civ. P. 63(A)(1)(b).
5. In its final determination, the respondent briefly recounted the procedural history, and reiterated the basis for its standing disability benefits calculation, which relied upon conclusions rendered in the January 29, 2002 Independent Medical Examination (hereinafter I ME) conducted by Subbanna Jayaprakash, M.D., Board Certified Physical Medicine & Rehabilitation Specialist. Decision & Order at 1 (citing Order Granting Additional Bene *236 fits at 1); see also Worker's Comp. Plan (hereinafter WCP), §§ 1.005, 015, 5.004, 008. Additionally, the respondent set forth the following reasons underlying its determination to uphold its prior decisions:
1. The two IME reports do not clearly define how reflex sympathetic dystrophy (RSD) is caused yet the two IME reports do coincide that the petitioner does in fact have the physical symptoms of RSD. In light of this contradicting and inconclusive evidence, the Commission cannot find in favor of the Petitioner on this issue.[5]
2. The professional article RSDSA written by Dr. Anthony Kirkpatrick (exhibit 45A) states that “RSD/CRPS [Complex Regional Pain Syndrome] remains poorly understood and is often unrecognized.”
3. Dr. Rudin’s deposition testimony dtd 2/25/05 (pg 6 line 12) states S. “And we urged her to stop smoking.” Page 8 lines 10-16 of same document summarizes that cigarette smoking can worsen the sensitivity of the condition.
4. End of healing for the petitioner was February 1, 2004 (3/28/07 HIRC deposition pg 2 line 19). Therefore, all medical expenses after February 1, 2004 are the sole responsibility of the petitioner per Ho-Chunk Nation Worker’s Compensation Plan dtd October 1998, section 4, 4.010 which states “when an employee has reached their end of healing, payments for medical cost will cease.”
Decision & Order (footnote added); see also HIRC Establishment & Org Act, § 13.9b.
6. On July 23, 2000, the petitioner completed an HCN Employee First Report of Injury form, describing a July 19, 2000 incident as follows: “[b]umped it (l[eft] hand) on door by employee entrance going to my table from breakroom.”[6] Admin. R.: HCN Employee First Report of Injury (July 23, 2000).
7. On December 29, 2000, John L. Lutz, DO, Reedsburg Area Medical Center, presented his impression of the petitioner’s condition, stating: “[r]eflex sympathetic dystrophy of left upper extremity secondary to crush injury of the left hand.” Id.: Outpatient Consultation (Dec. 29, 2000); see also id.: Outpatient Consultation (Oct. 31, 2000) at 1.
8. On January 12, 2001, Nathan Rudin, M.D., Assistant Professor in the Department of Rehabilitation Medicine at the University of Wisconsin Hospital & Clinics, indicated that “[s]moking cessation is vital for a patient with this pain condition.” Id.: Doc.: Pain Clinic (Jan. 12, 2001) at 4.
9. On March 8, 2001, Kristi Hallisy, MS, PT, in the Physical Therapy Clinic at the University of Wisconsin Hospital & Clinics, offered the following summation of the petitioner’s pertinent medical history:
The patient is a 42-year-old right hand dominant white female who reportedly *237 was in good health until July 19, 2000. At that time, she suffered an injury to the left hand while at work. She reports that she was ambulating through a doorway when a swinging door struck her in between digits 2 and 3 on the left hand. She reported an initial localized aching pain and attempted to return to work. She works as a casino dealer at Ho-Chunk Casino. She had a progressive increase in symptoms, and at this point in time has gone on to develop complex regional pain syndrome in the left upper extremity. She attempted physical therapy in the past, but at the time she was not tolerating any of the interventions attempted by PT (fluidoth-erapy, underwater US, ROM). She eventually ended up with a referral to the Pain Clinic and is now undergoing a multidisciplinary approach through the aid of Dr. Rudin. She reportedly has had a history of stellate ganglion blocks, which reportedly failed as well.
She now reports her pain as a constant aching, throbbing pain with some numbness and tingling and burning components. Her pain is rated today as an 8 out of 10 on a pain scale. The Therapeutic Associates Outcome Systems Functional Index reveals that the patient has a score of 18 out of 100, displaying severe disability in her upper extremity. She states she has severe cold intolerance and has taken to wearing a sock over her left hand while she is in public. She reports at home she usually uses a towel to cover her hand, such that she can occasionally use her hand if she is able to tolerate movements. There is some visible discoloration of the hand and slight swelling in the fingers and digits 2 and 3. She is allodynic to touch at all regions below the level of the elbow. She is also reporting muscular pains in the left shoulder girdle, neck and thoracic region. There does not appear to be any associated sweating with her current symptomatology. She has severe interruption of sleep and overall is extremely frustrated and depressed with her current situation.
Id..: Clinic Note (Mar. 8, 2001) at 1; see also id,: Clinic Note (Jan. 12, 2001) (indicating that the “nails have become brittle on that hand and grow more slowly than on the right”). Additionally, Physical Therapist Hallisy notes that the petitioner “is a two pack per day smoker, which could have a significant impact on her recovery.” Id.: Clinic Note (Mar. 8, 2001) at 1.
10. Dr. Jayaprakash concurs with the petitioner’s diagnosis in the IME:
Ms. Williams presents with a very unfortunate problem of a diagnosis of complex regional pain syndrome or reflex sympathetic dystrophy type I. The question of her diagnosis is not a matter of doubt. Her presentation has now led on to the fact that she has a severe degree of disuse with evidence of static edema, mottling of the skin due to lack of use, and progressive changes of contractures involving the hand.
Id.: IME at 9. Dr. Jayaprakash found “it ... quite interesting ... that the initial x-rays, isotope bone scan, and MRI [ (Magnetic Resonance Imaging) ] scan of the hand ... all indicated that there has never been any bone trauma or osseous trauma.” Id. at 10. In fact, the petitioner suffered no “significant injury to the hand beyond the fact that she had a minor blunt trauma.” Id, at 11. At this point, Dr. Jaya-prakash questioned the causal connection between the impact and the resulting condition, surmising:
We now have the question of a rather trivial injury to the hand subsequently leading to problems with severe limitations and disability of the hand on the left side. Reflex sympathetic dystrophy *238 or complex regional pain syndrome is an idiopathic condition that can originate in a variety of stress responses including trauma, psychological impairments, as well as with illnesses.... In Ms. Williams’ case, it is clear that the injury to the hand is not of a sufficient magnitude or of an extent, based upon the negativity of the investigations previously undertaken, to indicate that the extent of involvement of the hand was substantial. Indeed, in the absence of any bone or joint involvement or absence of nerve function the hand injury cannot be declared anything but a passing or a trivial problem.
Id. at 11-12. Consequently, Dr. Jayapra-kash deduces the following:
the question of reflex sympathetic dystrophy in the absence of a significant or objective injury, which was lacking in this situation, dearly originates from the fact that she probably has a psychological overlay syndrome that led to an abnormal response and eventually progressive findings that have resulted in a severe degree of lack of use of the upper extremities.
Id. at 12 (emphasis added).[7] In conclusion, Dr. Jayaprakash declares his “opinion rendered to a reasonable degree of medical probability that the onset of [the petitioner’s] reflex sympathetic RI dystrophy or complex regional hand syndrome is clearly of an idiopathic origin and not work related.”[8] Id. at 13. Therefore, in relation to an end of healing, Dr. Jayaprakash “believe[d] that beyond the emergency room visit and an initial visit by Dr. Tom Walker, within a matter of a one-week period of time, the recovery to the hand would have been essentially complete.” Id. at 13-14; see also WCP, §§ 4.010, 5.011. Stated another way,
[w]ith respect to her current clinical presentation, given the fact that the issue of the onset of the reflex sympathetic dystrophy is an idiopathic one and a natural manifestation of an underlying medical condition unrelated to her activity, the issue of the end of healing and a permanent partial disability does not arise.
Admin. R.: IME at 15.
11. On January 30, 2002, one (1) day after the issuance of the IME, Crawford & Company recommended to the Nation that it deny any further benefits on the basis of this medical assessment. Id.: Correspondence to Pet’r (Jan. 30, 32002); see also WCP, § 9.00KA-C). Crawford & Company serves as a third-party administrator of the WCP, and maintains its corporate headquarters at 5620 Glenridge Drive, Atlanta, GA 30342. See WCP, § 1.016.
12. The respondent relied upon a recognized clinical practice guideline in arriving at its final determination. Decision & Order at 1 (quoting Admin. II.: Clinical Practice Guideline—Second Ed. (hereinafter (JPG) at 2). “[T]he Clinical Practice Guidelines have become the standard for *239 managing reflex sympathetic dystrophy syndrome (RSD/CRPS) nationally and internationally.” Admin. R.: CPG at 1. The CPG explains RSD/CRPS as follows:
The best way to describe RSD/CRPS is in terms of an injury to a nerve or soft tissue (e.g. broken bone) that does not follow the normal healing path. The development of RSD/CRPS does not appear to depend on the magnitude of the injury (e.g. a sliver in the finger can trigger the disease). In fact, the injury may be so slight that the patient may not recall ever having received an injury. For reasons we do not understand, the sympathetic nervous system seems to assume an abnormal function after an injury .... At an advanced state of the illness, patients may have significant psychosocial and psychiatric problems. ...
Id. at 2-3 (emphasis added). In addition to an oftentimes minor trauma, “[a] number of precipitating factors have been associated with RSD/CRPS:
* Ischemic heart disease and myocardial infarction
.* Cervical spine or spinal cord disorders
* Cerebral lesions
* Infections
* Surgery
* Repetitive motion disorder or cumulative trauma, causing condition such as carpal tunnel.
Id. at 9. The CPG cautions against a “let’s try this now” approach since it may add “to the confusion, frustration, anxiety and depression of the patient.” Id. at 12. Nowhere in the CPG does the editor attribute an “idiopathic origin” to RSD/CRPS. Instead, the CPG advocates an early psychological evaluation for the purpose of rendering “an assessment o f pain coping skills and drug abuse potential.” Id. at 14.
13. On March 11, 2002, Dr. Rudin noted his “agree[ment] with Dr. Jayaprakash that the [petitioner] has complex regional pain syndrome of the left upper limb,” but “disagree[d] with the doctor’s theories of the causative factors underlying the development of the syndrome.” Id.: Correspondence to Counsel of Pet’r (Mar. 11, 32002) at 1. Dr. Rudin stressed: “there is no literature supporting a causative role of psychological factors in the genesis of complex regional pain syndrome. We do know that patients with CRPS do have higher than normal rates of depression and anxiety. However, we have no evidence that these conditions can actually produce the syndrom” Id.; see also id.: Dep. of Nathan J. Rudin, M.D. (Feb. 25, 2005) at 11-12.
14. On May 2, 2002, Dr. Rudin explained the effect of continued smoking upon an individual suffering from RSD/ CRPS.
Cigarette smoking does not cause CRPS (complex regional syndrome, also known as RSD), and I do not think your smoking is responsible for your developing CRPS, either partially or totally. It therefore does not make sense to attribute the majority of your disability to smoking.
Smoking can, however, make CRPS symptoms worse. It constricts the small arteries in the hands and feet, and can make painful conditions feel more painful.
Id.: Correspondence to Pet’r (May 2, 2002). Dr. Rudin revisited his assessment, stating:
There have been questions regarding the role of cigarette smoking in Ms. Williams’ permanent disability. While Ms. Williams continues to smoke, there is no evidence supporting a causative role of smoking in complex regional pain syndrome. We do recommend that *240 CRPS patients stop smoking, because the effects of cigarette smoke can theoretically worsen the pain. However, I believe within a reasonable degree of medical certainty that Ms. Williams [sic ] left upper limb would be totally disabled whether or not she smoked cigarettes.
Id.: Correspondence to Counsel of Pet’r (Sept. 17, 2002) at 2; see also id: Dep. of Nathan J. Rudin, M.D. (Feb. 25, 2005) at 6-8.
15. On May 21, 2003, Dr. Rudin commented that “[b]eeause the outcome of Ms. Williams’ workers’ compensation case remains undecided, she has been without income and without medical treatment for at least a year." He consequently surmised that “[t]he longer we delay occupational therapy and other treatment, the less likely she is to improve, and the greater her disability becomes.” Id: Correspondence to Counsel of Pet’r (May 21, 2003).
16. On February 25, 2005, Dr. Rudin testified that the petitioner’s “left upper limb, that’s from the shoulder down basically, is 100 percent disabled compared to amputation.” Id: Dep. of Nathan J. Rudin, M.D. (Feb. 25, 2005) at 8-9. He linked the incapacity to the petitioner’s minor injury, commenting “that is my opinion to a reasonable degree of medical probability.” Id. at 12. Furthermore, Dr. Rudin concluded that the petitioner reached a healing plateau in or around February 2004. Id at 9.
17. The petitioner’s request for relief is based upon the period of healing from the day after the date of the injury (January 20, 2002) until February 1, 2004. Tr. of HIRC Hr’g (Mar. 28, 2007) at 5; see also WCP, §§ 1.005, 4.001, 003-004, 010, 5.004, 011.
DECISION
The Court thoroughly examined the origin of administrative agency review and associated standards of review within a prior case. Regina K. Baldwin et al. v. Ho-Chunk Nation et aL, CV 01-16, -19, - 21 (HCN Tr. Ct., Jan. 9, 2002) at 12-26. The Court directs the parties to that decision for a comprehensive discussion.[9] For purposes of this case, the Court reproduces the portion of the discussion dealing with formal on the record adjudication.
Executive agencies may engage in formal on the record adjudication, resulting in the promulgation of rules through the formation of a body of case precedent. See, e.g., Dickinson v. Zurko, 527 U.S. 150, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999); Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998); Bowman Transp. v. Ark. Best Freight Sys., 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). In reviewing adjudicative rulemaking, as well as other forms of agency action, courts begin by recognizing that Congress intended the Administrative Procedure Act to “establish! ] a scheme of ‘reasoned decisionmaking.’”[10] Allentown, 522 U.S. at 374, 118 S.Ct. 818 (quoting Motor Vehicle Mfrs. Ass’n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 52, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). Courts then perform a two-tiered analysis, determining whether the adjudicative rule satisfies a substantial evidence standard, and, if so, whether the rule escapes a designation of arbitrary and capricious.
*241 The two (2) inquiries represent “ ‘separate standards.’ ” Bowman, 419 U.S. at 284, 95 S.Ct. 438 (quoting Citizens to Preserve Overion Park v. Volpe, 401 U.S. 402, 413, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). Consequently, a court “may properly eonclude[ ] that, though an agency’s finding may be supported by substantial evidence, ... it may nonetheless reflect an arbitrary and capricious action.” Bowman, 419 U.S. at 284, 95 S.Ct. 438. In such an event, the Court would afford no deference to the adjudicative rale of the agency precisely because the rule could not withstand the more deferential arbitrary and capricious standard.
The substantial evidence standard has no application beyond the review of “record-based factual conclusionfs],” and only in unusual circumstances will agency action surviving a substantial evidence review falter when scrutinized further. Dickinson, 527 U.S. at 164, 119 S.Ct. 1816. In performing the second-tier of analysis, arbitrary and capricious review,
[a] reviewing court must “consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.” The agency must articulate a “rational connection between the facts found and the choice made.” While [a court] may not supply a reasoned basis for the agency’s action that the agency itself has not given, [a court] will uphold a decision o f less than ideal clarity if the agency’s path may reasonably be discerned.
Bowman, 419 U.S. at 285-86, 95 S.Ct. 438 (citations omitted).
Typically, however, a court will suspend its review after ascertaining the presence of substantial evidence. “Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.” Edison Co. v. Labor Bd., 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). The relevant evidence must retain probative force, and, therefore, “[m]ere uncorroborated hearsay or rumor does not constitute substantial evidence.” Id. at 230, 59 S.Ct. 206. And, a court must examine the evidence supporting the decision against “the record in its entirety, including the body of evidence opposed to the [agency’s] view.” Universal Camera Corp. v. Labor Bd., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); see also 5 U.S.C. § 706.
Nonetheless, as noted above, an adjudicative rule rightfully subjected to the two-tiered analysis must also at its core represent the outcome of a reasoned deliberation. “[T]he process by which [an agency] reaches [its] result must be logical and rational.” Allentown, 522 U.S. at 374 118 S.Ct. 818. Courts accordingly must insure compliance with the requirement of reasoned decision-making. In this regard,
[i]t is hard to imagine a more violent breach of that requirement than applying a rule of primary conduct or a standard of proof which is in fact different from the rule or standard formally announced. And the consistent repetition of that breach can hardly mend it.... The evil of a decision that applies a standard other than the one it enunciates spreads in both directions, preventing both consistent application of the law by subordinate agency personnel ..., and effective review of the law by the courts.
Id. at 374-75, 118 S.Ct. 818. The inconsistent or contrary application of an adjudica *242 tive rule must result in a finding that the agency has failed to support its action by substantial evidence. A court cannot deem subsequent aberrations as simply agency interpretations of the underlying rule. Id. at 377-78, 118 S.Ct. 818.
To reiterate, a court must determine whether the challenged administrative action rests upon substantial evidence and escapes a characterization of arbitrary and capricious. Furthermore, the need for reasoned decision-making and the consistent application of resulting decisions underlie and overarch the statutorily based analysis. Apart from this predominate approach to agency review, instances exist when a court must designate an administrative decision as either contrary to law or otherwise not deserving of deferential treatment.
The HCN R. Civ. P. recognize that the Court may set aside an agency decision if deemed contrary to law. HCN R. Civ. P. 63(1). Such a seemingly broad recognition of judicial authority, however, does not invite or permit a de novo review in the context of a typical administrative review. That is to say, a court cannot bypass the obviously deferential standards of review when it perceives an isolated question of law. Rather, a court may only set aside an agency action as contrary to law when the agency clearly acts outside the parameters of its legislatively delegated authority. For example, this Court would not need to defer to a Grievance Review Board employment decision that claimed to determine an enrollment issue under the guise of a Ho-Chunk preference grievance. Such a decision would certainly be struck down as contrary to law regardless of whether the HCN Legislature incorporated this provision in the standard of review paragraph. See Willard Lonetree v. Larry Garvin, in his official capacity as Executive Dir. of HCN Heritage Pres., SU 07-04 (HCN S.Ct., Oct. 6, 2007) at 4 (noting appellate agreement with this premise).
Nowhere is this judicial authority more obvious than when a court encounters an administrative agency’s efforts to interpret and apply constitutional principles. “[C]onstitutional questions obviously are unsuited to resolution in administrative hearing procedures and, therefore, access to the courts is essential to the decision of such questions.” Califano v. Sanders, 430 U.S. 99, 109, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).[11] The HCN Legislature lacks the ability to confer constitutional adjudication authority upon an executive administrative agency. Lonetree, SU 07-04 at 4-6. Any such attempt would prove inconsistent with the theoretical and legal underpinnings of administrative power. See Baldwin, CV 01-16, - 19, -21 (HCN Tr. Ct, Oct. 3, 2003) at 15 n. 5.
In the instant matter, the respondent initially reduced the petitioner’s disability benefits after finding “that the Petitioner’s cigarette smoking contributed 75% of the loss.” Order Granting Additional Benefits at 1. As noted above, the respondent based this assertion on two (2) *243 alleged sources. First, the respondent declared that “[t]he article about RSD submitted by Petitioner indicated that cigarette smoking exacerbates RSD.” Id. However, no reference to cigarette smoking can be found in the CPG, rendering this assertion a fabrication. Second, the respondent stated that “Dr. Rudin indicated that smoking cessation is vital for a patient with this pain condition.” Id. The respondent may have accurately stated the advice provided by the petitioner’s referral physician, but, even so, such advice does not properly serve as a basis for the administrative decision.
Dr. Rudin later expanded upon his reference to cigarette smoking, remarking that “there is no evidence supporting a causative role of smoking in complex regional pain syndrome.” Admin. R.: Correspondence to Counsel of Pet’r (Sept. 17, 2002) at 2. The physician, in fact, never attributed smoking as a cause or contributing factor in the petitioner’s development of RSD/CRPS. Nothing in the administrative record, including the CPG and the IME, lends any support to such a proposition. Dr. Rudin always espoused that smoking could “worsen the sensitivity of the arm once the condition has been set up,” but nothing more. Id.: Dep. of Nathan J. Rudin, M.D. (Feb. 25, 2005) at 8.
Furthermore, the respondent’s decision to attribute seventy-five percent (75%) of the petitioner’s condition to cigarette smoking arises seemingly from nowhere. No medical testimony or documentation supported a claim of causation, thereby rendering any calculation pure fantasy. Moreover, the WCP permits the respondent to reduce disability benefits due to a preexisting condition if “partially due to [a] congenital condition or a prior disease or injury.” WCP, § 5.008. Cigarette smoking does not represent any of these identified sources of a preexisting disability. The Court accordingly holds that the respondent’s initial decision constitutes an arbitrary and capricious action and lacks substantial evidence to support its retention.
The respondent’s later decision to attribute an idiopathic origin to the petitioner’s condition falters for many of the same reasons. To be sure, the IME arrives at this conclusion, and, typically, an HIRC decision that relies upon an IME will escape judicial criticism. See, e.g., Karen Bowman v. HIRC, CV 06-62 (HCN Tr. Ct., Jan. 10, 2007). However, the administrative record is otherwise devoid of even a suggestion that RSD/CRPS can develop from a psychological impairment. Dr. Rudin, for instance, notes that “there is no literature supporting a causative role of psychological factors in the genesis of complex regional pain syndrome.” Admin. 11.: Correspondence to Counsel of Pet’r (Mar. 11, 2002) at 1. Dr. Jayaprakash nonetheless argues that “[r]eflex sympathetic dystrophy or complex regional pain syndrome is an idiopathic condition that can originate in a variety of stress responses including trauma, psychological impairments, as well as with illnesses.”[12] Admin. R.: IME at 11. Again, the administrative record corroborates the first and third enumerated responses, but only the IME purports that a psychological impairment can serve as a source for RSD/ CRPS.
The respondent bases its final determination, in part, upon the CPG, and its acknowledgement that “RSD/CRPS [Complex Regional Pain Syndrome] remains poorly understood and is often unrecognized.” Decision & Order at 1 (quoting Admin. R.: CPG at 2). Yet, this statement says nothing in relation to the known *244 causes of the condition. Every consulted physician recognizes the petitioner’s condition as RSD/CRPS. No controversy exists on this issue. The concession that the condition remains “poorly understood” is an unremarkable statement in and of itself. Any number of medical conditions would succumb to the identical criticism. More relevantly, the CPG enumerates the causes of RSD/CRPS, and each triggering event involves some form of injury. Admin. R.: CPG at 9.
The respondent cannot assert the presence of substantial evidence underlying its determination if it engages in a process of selectively seizing upon statements taken out of context. The respondent has chosen to rely upon the IME and largely, if not entirely, ignore the remaining evidence. The Court certainly hesitates in disputing the medical evaluation of a licensed physician, and claims no independent knowledge concerning the matters under question. Regardless, the Court can dispute the deductive reasoning of the physician, and analyze such reasoning against other evidence in the compiled record.
Dr. Jayaprakash reaches his conclusion by engaging in the following reasoning:
the question of reflex sympathetic dystrophy in the absence of a significant or objective injury, which was lacking in this situation, clearly originates from the fact that she probably has a psychological overlay syndrome that led to an abnormal response and eventually progressive findings that have resulted in a severe degree of lack of use of the upper extremities.
Admin. R.: IME at 12 (emphasis added). To begin, the internationally recognized standards for managing RSD/CRPS claim that the condition can arise from an “injury ... so slight that the patient may not recall ever having received an injury.”[13] Id.: CPG a t 2. University of, Wisconsin Assistant Professor Nathan Rudin, M.D. concurred: “[fit’s a matter of record that very minor injuries can precipitate complex regional pain syndrome.” Id.: Dep. of Nathan J. Rudin, M.D. at 11. Yet, Dr. Jayaprakash disputes a finding that the “trivial injury” in question could produce the condition without providing any justification for this departure from the understanding of the medical community. Id.: IME at 11.
In addition, the manner in which Dr. Jayaprakash establishes the petitioner’s psychological state at the time of the accident is worthy of comment. Dr. Jayapra-kash deems that “the question of reflex sympathetic dystrophy ... clearly originates from the fact that she probably has a psychological overlay syndrome ....” Id. at 12. First, Dr. Jayaprakash does not know whether the petitioner has a “psychological overlay syndrome.” He relies entirely upon the psychological evaluation performed by Steven J. Krause, Ph.D., in which the University of Wisconsin psychologist made no such diagnosis.[14] Id. at 6 (citing id.: Initial Psychological Evaluation ). Consequently, Dr. Jayaprakash speculates about the petitioner’s psychological state, and indeed designates his assessment as a mere probability. Second, despite this concession, Dr. Jayapra-kash labels his assessment as factual. Yet, how can one assert as a fact a probable *245 condition that has not been previously established by anyone? Third, Dr. Jayapra-kash contends that the petitioner’s RSD/ CRPS “clearly originates” from this “fact” that is not factual.
The above tortured line of reasoning elevates an unsubstantiated guess, lacking any clinical or academic support, to a dis-positive factual conclusion. The IME ultimately dispenses with the petitioner’s disability claim “given the fact that the issue of the onset of the reflex sympathetic dystrophy is an idiopathic one and a natural manifestation of an underlying medical condition unrelated to her activity.” Id.: IME at 15 (emphasis added). The respondent, in turn, adopted this conclusion as fact, and agreed with “[t]he finding of Dr. Jayaprakash in his independent medical exam, that the maximum medical improvement for the work injury occurred within the first week of the injury, and no permanent disability resulted from the incident.” Order Denying Additional Benefits at 1. The Court cannot join in this conclusion and accordingly holds that the respondent’s decision constitutes an arbitrary and capricious action and lacks substantial evidence to support its retention.[15]
The Court, therefore, reverses the final determination of the respondent, and directs the respondent to proceed with modifying the relief afforded to the petitioner.[16] The Court requests that the respondent inform it of the timeframe in which it can accomplish adherence with this judgment. The respondent shall file such notice within fifteen (15) days of the issuance of this decision.
The parties retain the right to file a timely post judgment motion with this Court in accordance with HCN R. Civ. P. *246 58, Amendment to or Relief from Judgment or Order. Otherwise, “[t]he time for taking an appeal shall begin from the date the judgment is filed with the [Trial Court] Clerk [of Court].” HCN R. Civ. P. 57. Since this decision represents a non-final judgment, “[a]n appeal from [this] interlocutory order maybe [sic ] sought by filing a petition for permission to appeal with the Supreme Court Clerk within ten (10) calendar days after the entry of such order with proof of service on all other parties to an action.” Ho-Chunk Nation Rules of Appellate Procedure, Rule 8.[17]
IT IS SO ORDERED this 14th day of November 2007, by the Ho-Chunk Nation Trial Court located in Black River Falls, WI within the sovereign lands of the Ho-Chunk Nation.

. The respondent, HIRC, failed to submit a copy of the hearing transcript, and did not rectify this deficiency until November 6, 2007, after several judicial requests. The applicable rules permit the respondent to file a recording, in lieu of a transcript, but this also did not occur in the case at bar. See HCN R. Civ. P. 63(D), (F)(2).

. On February 18, 2004, the Ho-Chunk Nation Legislature acted to dissolve Four Winds Insurance Agency, LLC, and, therefore, the Court removes this named party respondent from the caption in this case. This action does not prejudice the petitioner in any way.

. The Court does not perform a de novo review of administrative agency decisions, and, consequently, generally refrains from making independent factual findings. HCN R. Civ. P. 63(D-E). Unless otherwise clearly indicated, the below findings of fact constitute relevant findings of the administrative agency for purposes of this judgment as articulated within the administrative decision. The Court shall only propose alternative findings of fact in the event that the agency’s factual rendition is not supported by substantial evidence. See infra pp. 240-41.

. The respondent found that cigarette smoking contributed to seventy-five percent (75%) of the petitioner’s permanent partial disability, and based its disability benefits calculation on this finding. As corroboration, the respondent comments: "[f|he article about RSD submitted by Petitioner indicated that cigarette smoking exacerbates RSD[,]” and in a “January 16, 2001 report ..., Dr. Rudin indicated that smoking cessation is vital for a patient with this pain condition.” Order (Granting Additional Benefits) at 1. The Court can locate no such reference in the cited article, and the comments by the referral physician appear out of context. See infra p. 243.

. The petitioner submitted to only a single IME as conducted by Dr. Jayaprakash.

. On July 22, 2000, the petitioner received urgent care at St. Clare Hospital & Health Services for the injury, and the resulting hospital documentation noted that “Sharon Williams is a 42-vear-old Ho-Chunk employee who, outside of work, wrapped her left hand against a wall.” Admin. R.: Urgent Care (July 26, 2000). Regardless, the petitioner has consistently claimed an on-site employee accident as reflected in every other document appearing in the administrative record. The Court shall not disrupt this finding that has prevailed for several years, especially absent any contention from the respondent. The respondent questioned the origin of the injury at its March 28, 2007 hearing on remand, but nonetheless entered a final determination without taking any further evidence on this matter. Tr. of HIRC Hr'g (Mar. 28, 2007) at 23-30.

. The petitioner's earlier psychological evaluation revealed that she "seems to see herself as helpless to cope with the pain when it is severe." Admin. R.: Initial Psychological Evaluation (Mar. 29, 2001) at 2. More specifically, the petitioner reported "significant depressive symptoms, including poor memory and concentration, crying spells, feelings of hopelessness and helplessness, anhedonia, and sleep disturbance." Id. Steven J. Krause, Ph.D., Senior Psychologist at the University of Wisconsin Hospital & Clinics, acknowledges the petitioner's anxiety in certain situations arising from coping with a comatose child for ten (10) years, but does not link current psychological manifestations to this event. Id. at 1-3; see also Admin. R.: IME at 6.

. In regards to smoking, the IME merely states: “smoking 2-1/2 packs of cigarettes per day w[as] also noted.” Admin. R.: IME at 6.

. The full text of Baldwin appears at www.ho-chunknation.com/?PageID= 156.

. The HCN Legislature has incorporated the acknowledged federal standards within certain legislation. See, e.g., Gaming Ordinance § 1101(c)(v); compare 5 U.S.C. § 706.

. The following federal circuit court assessments reinforce this unassailable premise. ”[A]s a general rule, an administrative agency is not competent to determine constitutional issues.” Petruska v. Gannon Univ., 462 F.3d 294, 308 (3rd Cir.2006). "To be sure, administrative agencies ... cannot resolve constitutional issues. Instead, the premise of administrative exhaustion requirements for petitioners with constitutional claims is that agencies may be able to otherwise address petitioners’ objections, allowing the courts to avoid unnecessary constitutional decisions.” Am. Coalition for Competitive Trade v. Clinton, 128 F.3d 761, 766 n. 6 (D.C.Cir.1997). "[A] reviewing court owes no deference to the agency's pronouncement on a constitutional question.” Lead Indus. Assoc., Inc. v. EPA, 647 F.2d 1130, 1173-74 (D.C.Cir. 1980).

. Importantly, cigarette smoking is not an enumerated cause of RSD/CRPS within the IME.

. To reiterate, the HIRC decision relies upon a single phrase from the CPG, and seemingly ignores the following paragraph, which includes the above quote only three (3) sentences later. Of course, affording recognition to the leading academic treatise on the matter would tend to undermine the basis of the resulting decision.

. Dr. Krause did indicate that the petitioner experienced depression and anxiety as a result of the condition. One could hardly expect a different reaction, which the CPG easi *245 ly acknowledges due to the debilitating effects of RSD/CRPS. Admin. R.: CPG at 14. The petitioner has needed to cope with grave uncertainty regarding the rehabilitation of her left arm amidst more uncertainty caused by this lengthy legal process.

. As a final note, the respondent also submitted the following reason as a basis to deny worker’s compensation:
The two IME reports do not clearly define how reflex sympathetic dystrophy (RSD) is caused yet the two IME reports do coincide that the petitioner does in fact have the physical symptoms of RSD. In light of this contradicting and inconclusive evidence, the Commission cannot find in favor of the Petitioner on this issue.
Decision & Order at 1. Apart from the fact that only one (1) IME exists, the "contradicting and inconclusive evidence” refers to the claimed idiopathic origin of the condition, which does not represent evidence and is contradictory to the administrative record as a whole.

. Prior case law has questioned whether a waiver of sovereign immunity appears within the WCP, but the Court resolved the issue by reference to a former limited waiver of sovereign immunity incorporated into a predecessor employment relations statute. Michelle M. Ferguson v. HIRC/Div. of Risk Mgmt., CV 99-20, 2 Am. Tribal Law 295, 2000 WL 35716346 (HCN Tr. Ct„ Sept. 5, 2000). The Court declines to discuss the rationale employed within the Ferguson decision, and instead adopts the recently articulated position of the HCN Department of Justice (hereinafter DOJ). The HCN Supreme Court previously decided that “[wjhile the trial court should try to remain consistent in its decisions, only decisions by this court are limitations on the Trial Court.” Jacob LoneTree et al. v. Robert Fun maker, Jr. et al, SU 00-16 (HCN S.Ct., Mar. 16, 2001) at 3-4. The DOJ argues that a court order directing compliance with the WCP guidelines resembles an equitable remedy rather than a legal money judgment, since the WCP was adopted to foreclose and supplant suits for monetary' damages. Susan Bosgraff et al. v. Ho-Chunk Nation et al., CV 06-99, -105, Respondents' Br. (May 2, 2007) at 5-8. Moreover, the respondent in the case at bar did not raise a defense of sovereign immunity from suit, and, therefore, such defense is deemed waived. Louella A. Kelty v. Jonetle Pettibone et al., CV 98-49, 6 Am. Tribal Law 320, 2006 WL 5891107 (HCN Tr. Ct. Feb. 22, 2006).

. Parties can obtain a copy of the applicable rules by contacting the Ho-Chunk Nation Judiciary at (715) 284-2722 or (800) 434-4070 or visiting the judicial website at www.ho-chunknation.corn/?PageID = 123.